THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Sealed
Public and unofficial staff access to this instrument are prohibited by court order.

### AFFIANT IN SUPPORT OF SEARCH WARRANT

I, Mark Pappaioanou a Special Agent with the United States Postal Service, Office of Inspector General, being duly sworn upon my oath, state as follows:

### A. AFFIANT EXPERIENCE AND EMPLOYMENT

1. "I have been employed as a Special Agent with the United States Postal Service, Office of Inspector General ("USPS-OIG") since April 2011. Prior to my employment with the USPS-OIG, I worked for the Fishers (Indiana) Police Department, from May 1999 thru April 2011, where I served in various positions including Police Officer, Detective, Sergeant, and Federal Task Force Officer. As a Special Agent with the USPS-OIG I am charged with investigating violations of the laws of the United States, collecting evidence in cases which the United States is or may be a party in interest, and investigating crimes involving funding from the United States Postal Service. As a Special Agent I have been trained in the execution of search warrants for documents and other evidence in cases involving violations of federal law including but not limited to: Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy), and Title 42, United States Code, Section 1320a-7b (Kickbacks). I am currently assigned to the Houston Office, Southern Areas Field Office of USPS-OIG. I am being assisted in this investigation by the Department of Labor, Office of Inspector General ("DOL-OIG"), the Internal Revenue Service, Criminal Investigations ("IRS-CI"), Veterans Affairs, Office of Inspector General ("VA-OIG"), and the Department of Homeland Security, Office of Inspector General ("DHS-OIG").

### B. PLACE TO BE SEARCHED

2. This affidavit is made and submitted in support of an application for a warrant to search and seize evidence at 2626 South Loop West, Houston, Texas 77054, Suite 260, hereinafter referred to as the "Premise." The Premise is a suite that is the corporate office for Team Work Ready ("TWR") a health care business and its associated businesses.

3. Suite 260 is located in a large glass building. On the south side of the glass building are numbers reading "2626" and "Team Work Ready." The building is surrounded by parking lots with entrances on the north and south side of the building. Photographs of the Premises are included in Attachment A to the affidavit, incorporated by reference as if fully described herein.

### C. PURPOSE OF SEARCH WARRANT

4. The statements in this affidavit are based upon information I learned during the investigation, information provided to me by Special Agents of the DOL-OIG, IRS-CI, VA-OIG, DHS-OIG, public sources, business records, and my experience and background as a Special Agent.

5. Because this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of crimes, fruits of crimes, contraband, and other items illegally possessed, in violation of federal laws, including 18 U.S.C. §§ 1347, 1349, and 42 U.S.C. §1320a-7b, are currently located at the Premise to be searched.

6. Based on the affiant's investigation into Team Work Ready ("TWR"), it is the affiant's belief that TWR engaged in violations of federal criminal law including violations of 18 U.S.C. §§ 1347, 1349, and 42 U.S.C. §1320a-7b, and that there is probable cause to believe that a search of the aforesaid Premise will reveal evidence of those violations, including financial, business, patient, and other records related to fraudulent claims submitted to the Department of Labor, Office of Workers' Compensation ("OWCP"), and documents and records related to a kickback scheme that involved the sale and distribution of TWR patients to various health care providers. It is the affiant's belief that Today's Marketing Agency LLC ("Today's Marketing") which is owned by the owner of TWR, was involved in the kickback portion of the suspected health care fraud and money laundering violations. The items to be seized are described in Attachment B of this affidavit, incorporated by reference here as if fully set out herein.

7. Based on my experience, training, and participation in investigations of illegal health care businesses, including experience gained in executing search warrants for records and other evidence, I know:

a. The records and items described in Attachment B are the type of records and items kept in the normal course of business for health care businesses and health care marketing companies such as TWR and Today's Marketing. Furthermore, many of the records described in Attachment B are required to be maintained by OWCP regulations.

b. It is customary for individuals, businesses and related employees, agents, clients, and individuals involved in the operation of health care businesses to maintain and accumulate certain types of records in order to function in the financial aspects of their lives and to otherwise continue their day to day operations. These records, documents, and items are normally maintained at locations within residences, businesses, storage facilities, or other areas to which these individuals would have ready access. These records include but are not limited to items listed in Attachment B.

c. The records, documents, and items, described in Attachment B are stored by individuals in secure locations, including safes, filing cabinets, lockable desks and other furniture located within residences, businesses, and owned or leased storage facilities; in electronic form in facsimile machines, electronic organizers, smartphones, Blackberry devices, cellular telephones, personal computers, and tablets such as ipads, all with software set up for the purpose of maintaining such data; in safe deposit boxes, both private and those maintained by financial institutions; and in automobiles and other motor vehicles in and around residences and businesses controlled by these individuals.

d. Further, it is common for individuals who engage in fraudulent activates to maintain records or other evidence relating to their obtaining, secreting, transferring, distributing, concealing, and expending of proceeds from criminal activity, such as: book, records, invoices, receipts, records of real estate transactions, bank statements and related records, certificates of deposit, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, money wrappers and other evidence of financial transactions.

8. Based on my training and experience, I am not aware of any similar search of a business office, such as the premise, pursuant to the type of information contained in this Affidavit that has not yielded at least some of the type of evidence described in Attachment B.

## D. THE FEDERAL EMPLOYEES COMPENSATION ACT

9. The Federal Employees Compensation Act (FECA) provides monetary compensation, medical care, and vocational rehabilitation to civilian employees of the United States Government, including Postal Service employees, for work related injury or disease. The FECA program is administered by the OWCP. Federal employees are entitled to receive medical services and other benefits for work-related injuries.

10. All providers are required to enroll with OWCP though its designated bill processing agent, ACS. After ACS enrollment providers may request pre-authorization for certain services, submit claims for services or benefits provided, and obtain payments. By competing and submitting Form OWCP-1168 the provider certifies that they satisfy all applicable Federal and State licensure and regulatory requirements that apply to their specific provider or supplier type.

11. Health care providers are required to use the American Medical Association Current Procedural Terminology ("CPT") codes when they submit claims. The CPT® codes describe health care services and procedures. Many CPT codes are time based, in 15 minute increments, including CPT code 97530 which is used for direct one-on-one therapeutic activities, and CPT Code 97110 which is used for therapeutic exercises. OWCP reimbursement payments are made either electronically or mailed to providers with funds from the U.S. Treasury. Payments are tracked by OWCP through a transaction control number.

12. When providers submit claims to OWCP and receive payments for those claims from OWCP they are certifying that each service was performed as described, necessary, appropriate and properly billed in accordance with accepted industry standards. Accepted industry standards preclude, among other things, charging for the services of a professional when a paraprofessional or aide performed the services. All claims for health care services and benefits must be supported by medical evidence that documents, among other things, the history of the injury, a description of the nature and extent of the injury, the results of and diagnostic studies performed, the nature of the treatment rendered and the degree of any impairment and/or disability arising from the injury.

13. Reimbursement for chiropractic services is limited by FECA to treatment to correct a spinal subluxation; however, a chiropractor may also provide services in the nature of physical therapy under the direction of, and as prescribed by, a qualified physician.

### E. PROBABLE CAUSE

14. This affidavit alleges that TWR falsely and fraudulently submitted claims to the OWCP for health care services that were not provided to patients. The investigation showed that the head chiropractor hired by TWR was not providing physical therapy and that techs who were not licensed or trained in physical therapy were not providing one-on-one physical therapy. In addition TWR used Today's Marketing to receive funds from providers of health care services in return for sending TWR patients to those providers for various health care services, and at least one elderly medical doctor and one surgeon with shaky hands, paid TWR a percentage of their billings in return for seeing the TWR patients. Based on Affiant's investigation, probable cause for this search warrant is based on the following facts and information.

15. Records from the Texas Secretary of State, OWCP enrollment documents, and a TWR website viewed by affiant in July of 2015, show that TWR has ten (10) office locations nationwide, including Federal Work Ready ("FWR") and Federal Work Ready North ("FWR-N") in Houston, Texas; Alamo Work Ready ("AWR") in San Antonio, Texas; and Bayou Work Ready ("BWR") in New Orleans, Louisiana. Current and former TWR employees have stated that all the billing for the TWR clinics is done in Houston, Texas.

16. OWCP records confirm that TWR through its multiple office locations has enrolled as a service provider with OWCP. OWCP records and current and former TWR employees identify 2626 South Loop West, Houston, Texas, 77054, Suite 522 as a medical office for FWR, and Suite 260 as the TWR corporate office.

17. Current and former TWR employees have identified the following individuals: Jeffrey Rose as the owner and Chief Executive Officer; Pamela Rose, the wife of Jeffrey Rose, as the co-owner and Chief Financial Officer; Frankie Sanders as the Vice-President of Operations; and Hugo Jaime D.C., as the Director of Rehabilitation and Vice President. In addition, Jeffrey Rose was identified by employees as the owner of Today's Marketing.

18. Records from the Texas Secretary of State show Suite 522 as the business address for American South Central Orthopedic Clinic and that Dr. JK as one of the founding members of the business. Chase Bank records show that Jeffrey Rose had signature authority on the American South Central Orthopedic bank account, along with Dr. JK.

19. Texas Medical Board records show that Dr. LT and Dr. JK are licensed physicians in Texas. Current and former TWR employees including the former Chief Operating Officer have stated that Dr. LT and Dr. JK pay Jeffrey Rose 30 – 40% of the revenue they earn for seeing patients sent to them by Jeffrey Rose. These funds are allegedly for marketing purposes but TWR does not market the physicians, it sends them TWR patients. Documents from the Texas Secretary of State show that American South Central Orthopedic was an entity set up

by Dr. JK. Bank records show that Jeffrey Rose had signature authority on the American South Central Orthopedic bank account. Surveillance by federal agents on June 30, 2015 showed that American South Central Orthopedics is in the same suite as FWR, Suite 522, 2626 S Loop West, Houston, Texas.

20. During the course of the investigation Affiant conducted a detailed analysis of TWR patient files. The daily treatment notes within the patient files appear to reflect skilled one-on-one physical therapy services were provided to patients at TWR; however interviews with former and current TWR employees reveal that unlicensed techs and students from local colleges were providing the services. Those interviewed also spoke of minimal on the job training and too many patients for techs to provide services too. The techs interviewed said the only one-on-one services they typically provided were massages, ultrasound treatments, and electrical stimulation treatments. The techs also told federal agents that there were no licensed physical therapists at TWR and that the Hugo Jaime D.C. did not actually provide hands on physical therapy.

21. During the course of the investigation Special Agents interviewed former FWR employee AH. AH said she was hired by Jeffrey Rose and worked as a case manager for FWR between 2011 and January 2013, when she was fired. AH said there were no certified physical therapists at any of the FWR locations, and that none of the techs providing physical therapy have any formal education in physical therapy. AH said on-the-job training was provided to techs by TH who also has no formal physical therapy training. AH stated that manager Frankie Sanders instructed case managers to review, modify, embellish, manipulate and falsify patient medical documents and reports. AH said the chiropractor Jamie would edit evaluations conducted by Dr. LT so they would be more favorable for additional treatment. Additionally, AH said that Hugo Jaime D.C. and another case manager had signed documents with Dr. LT's signature without Dr. LT's knowledge.

AH said Hugo Jaime D.C. created a spreadsheet with each patient's name and treatment plan. AH said that no matter how long a patient participated in therapy, FWR would bill for all the treatments on the spreadsheet. AH said some patients would sign in at reception and not do any physical therapy. AH also said that "work conditioning" patients would come and watch television and then leave, and that Jeffrey Rose would bring in lunch for the work conditioning patients. AH said that Houston patients were sent to San Antonio to receive injection treatments, and that they were received travel money and were given one night's accommodation in a hotel for going to San Antonio.

AH said patients who complained to Jeffrey Rose about money issues were sometimes given cash, including one patient who told AH she received $500.00. AH said that MRI providers changed depending on who gave Jeffrey Rose the best deal, and that Dr. JK gave Rose the best deal for surgery referrals.

22. AH made an OIG hotline complaint regarding TWR after she was fired, on January 29, 2013. Affiant reviewed the hotline complaint and found the statements within it were consistent with the interview statements of AH.

23. During the course of the investigation Special Agents interviewed former employee NH who worked at both FWR and BWR locations. NH completed chiropractic school

in 2011 but was not yet a licensed chiropractor. NH worked for TWR from January 2012 to September 2012 when she was fired, for "not going along with the program." NH performed Functional Capacity Exams ("FCE"). NH said Jeffrey Rose told her to make all the FCE results "light." NH said that when she told Rose that she could not make all the results light, Rose told her, "I need my money. I get my money. You get money." NH said some of the patients, did not properly perform FCEs because they were motivated to stay off work. NH also said that the FCEs for patients JJ and JC were altered from medium to light capacity after she completed them. NH further said that chiropractor Jamie would edit reports completed by physician Dr. LT to help the cases get accepted by either the state or federal workers' compensation programs.

NH said there are no licensed physical therapists at FWR and that new techs were trained by TH who had a degree in funeral services. NH said therapy techs did not keep track of patients who were doing therapeutic activities or exercises. NH said she observed as many as 50 patients at FWR at one time. NH said that patients would often stand around talking and watching television and that the patients were not doing the therapy that was billed. NH said all the daily treatment notes were completed at the end of the day using the treatment guide created by Hugo Jamie D.C. NH said techs were instructed to mark on the treatment notes the exercise equipment patients used, even if they did not know what the patient completed. NH said that one patient told her that she came to FWR to get a year of paid vacation from work. Rose told NH that it did not matter if the patient completed physical therapy, as long as the patient was at the clinic.

NH said work conditioning was a big money maker for FWR. NH said the information on these notes was falsified and not what the patient actually did. NH said these notes were created to document the patient's time at the clinic and were signed by the Hugo Jamie D.C even though the patients would sit and watch television and not do work conditioning activities. Rose told NH that each patient in work conditioning was worth $5,000 per week.

24. During the course of the investigation an undercover federal agent, known as "SW," went to FWR as a patient. SW went to FWR in December 2012 and January 2013. SW observed other patients sitting, talking on the phone, talking to each other, or watching television while they were supposed to be doing therapy. SW observed staff sitting in the therapy room talking to each other and not paying attention to the patients. SW said the FWR staff did not assist her with therapy activities. SW received a bag containing durable medical equipment ("DME") from Select DME while a FWR patient. SW said that no one at FWR ever instructed her on how, or when, to use the DME, and that no one ever asked her if the equipment was helping her injury, or if she had even used it. SW also received a compound medication via mail that she was never told how, or when, to use. This compound medication was prescribed by Dr. KJ and continued to be received after SW no longer was a patient at the clinic.

25. During the course of the investigation Special Agents interviewed former FWR employee BR. BR said she worked at FWR from November 2012 to April 2013 as physical therapy tech. BR said she had no formal education in physical therapy and received on the job training by chiropractor Jamie and another employee TH. BR said FWR used a cheat sheet created by chiropractor Jamie to complete the daily treatment notes. BR said the cheat sheet was used by techs to complete the daily treatment notes no matter what patients actually completed and that management required techs to claim all billable physical therapy units.

26. During the course of the investigation Special Agents interviewed HS, who was a patient at AWR between October 2012 and January 2013. HS said that during therapy sessions no one told him a set number of times to perform each exercise or how long to do the exercises. HS said he observed other patients not doing exercises and just talking. HS said that when he went for therapy the techs would ask him what he wanted to do for the day. Usually HS said he limited his therapy to about 1 hour, but that AWR wanted him to stay 1 ½ hours. HS said his treatment did not change throughout the time he was at AWR. HS said he received a bag of DME from AWR and was told it was complements of the DOL. HS said no one ever explained how to use the DME. HS said he also received a box of medication from
in the mail every two weeks. HS was never told he would receive this medication and was never informed how to use it. After HS left AWR in January 2013 he continued to receive the medication in the mail.

27. During the course of the investigation Special Agents interviewed ST who was a patient at AWR between October 2012 and July 2013. ST learned about AWR when he attended a union seminar. ST said he used the Nintendo Wii video game a few times as therapy at AWR, and that he sat in a massage chair. ST told agents that he was surprised to receive a medicated cream from         via mail, and that he received an absurd amount of the cream. ST was also provided therapy by a tech from AWR at a hotel in Carrizo Springs, Texas. The tech who provided the Carrizo Springs services told federal agents that she is not licensed to provide physical therapy and that no chiropractor or medical doctor supervised the treatment she provided at the hotel.

28. During the course of the investigation Special Agents interviewed former FWR-N employee AS. AS was the licensed chiropractor in charge of FWR-N between September 2011 to July 2013. AS said she and Hugo Jamie D.C. reviewed and edited the reports of Dr. LT. AS described Dr. LT as an old doctor who didn't always know what was going on. AS said she sought Dr. LT's approval before making changes to his reports, but that it would be possible to make changes without his knowledge or consent.

AS recalled receiving an email from Hugo Jamie D.C. in April of 2012, stating that Jeffrey Rose wanted all the patients who needed injections to be sent to San Antonio. AS said that the patients who went to San Antonio were paid for going to San Antonio and provided an overnight hotel room.

Jeffrey Rose told AS that FWR-N needed to be billing at least 6 units of therapy per patient. AS had a job performance evaluation on March 26, 2013 with Pamela Rose, Jeffrey Rose, and Frankie Sanders. The evaluation of AS stated that (1) she "needed to embrace the vision of the organization" and that (2) she did not "maximize patient treatment." During her evaluation management AS was told by Jeffrey Rose and Frankie Sanders, who were neither doctors nor chiropractors, that if a treatment did adversely affect a patient and it was billable, she should do it.

29. During the course of the investigation Special Agents interviewed JC a former Chief Operating Officer for TWR. JC worked for TWR from October 2012 thru May 2014. JC said Dr. LT and Dr. JK paid Jeffrey Rose a percentage of their gross billing for seeing TWR patients. JC said Jeffrey Rose set up deals with medical providers including hospitals,

pharmacies, and diagnostic companies, that resulted in Jeffrey Rose being paid for sending patients to providers. JC said the marketing agreements were done by Today's Marketing. JC said he would not want to receive physical therapy at TWR nor would he allow Dr. JK to perform surgery on him. JC said Pamela Rose and Jeffrey Rose moved approximately $700,000 from TWR bank accounts to hide it from Federal Agents in July 2013. JC said Rose wanted to maximize profits by maximizing treatment.

30. During the course of the investigation Special Agents interviewed chiropractor CO who oversaw the TWR aquatic therapy program from October 2012 thru October 2014. CO said when the aqua program first started Frankie Sanders wanted it billed for six units (1 ½ hours). CO said she did not evaluate patients prior to starting aqua therapy or after aqua therapy. CO said they did a 20 minute warm up as a group then they did individual exercises. Group aqua therapy included water volleyball. Chiropractor CO said the aquatic therapy provided was not one-on-one and that it was in a group setting. CO said the techs at TWR were not trained or qualified and she frequently saw them doing things wrong. Chiropractor CO talked to Jeff Rose about the lack of qualified staff at the clinic and told agents that he didn't seem to care. CO occasionally filled in for land based physical therapy and signed daily treatment notes without knowing if the therapy had been completed. Chiropractor CO was told by Dr. JK that he paid Jeff Rose 50% of the payments he received for surgeries on TWR patients. Chiropractor CO said as of May 2015, TWR was still providing aquatic therapy in a group setting.

31. In May 2015 Special Agents interviewed current TWR employee TH. From 2011 to May 2013, TH was the lead therapy tech at FWR. TH said as a tech she was never informed by Hugo Jamie D.C. that patients needed to be monitored one-on-one for physical therapy. TH said the only one-on-one therapy was ultrasound and massages. TH said there were typically two to three patents to one tech and that Hugo Jamie D.C. rarely came out onto the treatment floor. TH said Jeffrey Rose wanted to maximize the number of units of treatment billed and the number of patients being seen per day. In addition, TH said Jeffrey Rose knew the clinic was understaffed for the number of patients that were being seen and that students were bought in to help the techs. TH said the techs would not complete the daily treatment note until the end of the day, and then they would use a cheat sheet to mark down what the patient was supposed to have done. TH said techs allowed patients to do whatever they wanted in therapy and that some patients referred to therapy as "social hour" since they would meet up with friends at the clinic. TH said Jeffrey Rose would yell at the therapy staff and tell them to allow the "customer" to do whatever they wanted. TH said she signed daily treatment notes for patients she had not assisted, and that Hugo Jaime D.C., told her that code 97530 was for activities such as the treadmill and weights, when equipment was used, and that code 97110 was used for activities without equipment such as thera-bands and the wobble board.

In May of 2015, TH worked in the billing department for TWR, and stated that the physician doctor evaluations were no longer being billed based on the length of reports, but on the information contained in the reports. TH also said Pamela Rose was now acting as the Chief Operating Officer.

32. During the course of the investigation Special Agents interviewed IV who was a FWR patient from January 2012 to at least May of 2015. OWCP data shows FWR submitted a claim for five (5) units of aqua therapy for IV on May 6, 2015. When she was interviewed by

federal agents in September of 2014, IV said she participated in group aqua therapy and that the services were not one-on-one. IV also said that on occasions the treatment area at FWR had more patients than there was staff to assist, and that sometimes the patients had to wait in the waiting area for someone to leave before they were allowed in because there was not enough equipment. IV further said that she travelled from Houston to San Antonio to receive an injection and was provided with a hotel room for the night.

33. During the course of the investigation Special Agents interviewed RB a former marketing representative for Today's Marketing. RB was hired by Injured Workers Network in June of 2013 to market TWR to injured federal employees. RB was fired from Today's Marketing in June of 2015. RB was specifically hired to market to Hispanics in McAllen, Houston, Corpus Christi, and San Antonio. RB said Jeffrey Rose owned Today's Marketing which is located at 2626 S Loop West, on the 6th Floor. RB said inside the office of Today's Marketing there is a board that lists the outside providers that do business with Today's Marketing. RB has seen invoices go out to these providers for over $60,000. RB said on June 27, 2015, Today's Marketing was to hold a fishing trip for Union Officials and Shop Stewards in Galveston that included fishing, a dinner, and overnight lodging. RB described Today's Marketing as a cover for whoever is paying TWR kickbacks.

34. During the course of the investigation Affiant identified approximately nine patients that discussed union referrals to TWR clinics. Additionally, three former employees said TWR had a close affiliation with union officers.

35. In May 2015 federal employee IJ sought treatment at FWR-N for a bee sting. The doctor at FWR-N completed a report saying IJ was completely incapacitated and unable to work. IJ was subsequently observed by federal agents cleaning out her garage with her alleged injured hand, and hosting a craw fish boil at which she was observed lifting heavy baskets of food with her alleged injured hand. These observations were inconsistent with the level of incapacitation stated by the doctor. IJ said TWR had planned to treat her with physical therapy. IJ withdrew her claim for OWCP benefits when she was interviewed by federal agents on June 22, 2015.

## F. CURRENTLY OPERATING

36. Current TWR employee TH said in June of 2015 that Dr. LT was still working at TWR. Current TWR patient IJ said in June of 2015 that TWR was planning to begin a physical therapy program for her.

37. Surveillance conducted by agents on July 1, 2015, confirmed that Suite 260 was still operating as part of the TWR network.

38. The FWR-N letter head for the physician evaluation for IV that was received by OWCP on June 4, 2015, contains the names of Dr. LT and Dr. JK.

39. In July 2015, Affiant viewed a website advertising and promoting TWR. The website described the business as a full-service therapeutic clinic and states that services are provided by certified and licensed medical professionals.

40. Recent OWCP claims data reviewed by Affiant shows that between January 2011 and May 2015, TWR submitted to FECA through OWCP at least $6,787,058.72 in claims and received at least $5,656,778.00 as payment for those claims. Affiant also determined that claims were submitted by Dr. LT as recently as April 30, 2015; claims were submitted by Dr. JK, through South Central Orthopedics, as recently as April 22, 2015, and claims for aqua therapy as recently as May, 12, 2015.

## G. CONCLUSION

41. Based on the aforementioned facts, Affiant states that there is probable cause to believe, and does believe, that TWR along with others known and unknown, have violated, and are likely to continue to violate, 18 U.S.C §§ 1347, 1349, and 42 U.S.C. §1320a-7b, and that evidence of said violations, including patient files, treatment sheets, business and financial records, emails, billing records and instructions, will be found at the premise described herein.

42. Furthermore, based on the aforementioned facts including the information provided by TWR employees, Affiant states that there is probable cause to believe that the violations of 18 U.S.C. §§ 1347, 1349, and 42 U.S.C. §1320a-7b, are ongoing.

43. In consideration of the foregoing, I respectfully request that this Court issue a search warrant for the Subject Premise authorizing the search of this location, as described more fully in Attachment A and the seizure of items described in Attachment B both incorporated by reference herein."

Mark Pappaioanou
Special Agent
United States Postal Service
Office of Inspector General

Subscribed and worn to before me on July 7, 2015 and I find probable cause.

Judge Frances H. Stacy
United States Magistrate Judge

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

The property to be searched is Suite 260 of the building located at 2626 South Loop West, Houston, Texas, 77054, consisting of a six story glass building with brown siding and "Team Work Ready" in letters between the fourth and fifth floor on the south side of the building. On the east side of the building are the numbers "2626," between the fourth and fifth floor. There is an entrance to the building on both the south and north side of the building. The building is surrounded by parking lots.

The entrance consists of glass doors, which lead into a lobby area for the entire building. Inside the lobby, in the center, is a bank of elevators. Suite 260 is located on the second floor and is a brown wooden door with a white sign with the numbers "260."

Below are photographs of the exterior of the building, and the suite doors:







## ATTACHMENT B

## ITEMS TO BE SEIZED

Any and all of the following named items and information relating to TWR and its associated clinics and businesses, including Today's Marketing Agency, LLC relating to violations of 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud), and 42 U.S.C. § 1320a-7b (kickbacks) for the period March 1, 2011, through the date of the execution of the search warrant in this matter. This information may be stored or filed, and includes any format in which the information may exist.

1. All documents constituting, concerning, or relating to: patient files and treatment, including but not limited to: physician evaluations and assessments, including drafts and edited versions; therapy notes; diagnostic testing; daily treatment notes for the following patients: Monica A    Sherry A    Nancy A    Toni B  ;  Phyllis B    John B    Trina B    James B    Cynthia C    Many C    Aaron C    Dianne C    Cheryl C    Donald C    Dinah C    Charles D    Andre D    Acklin F    Donna G    Linda G    Cynthia G    Esther H    Yvette J    Jacqueline J    Patricia J    Vonola J    Lloyd L    Nathaniel M    Delores M    Harold M    Anna M    Michael N    Lizy R    Shirley R    Steven R    Thomas R    Felicia R    Tamisha S    Edolia S    Hazel S    Talisa T    Regina T    Rebecca T    Ingrid V    Peggy W    and Michael W

2. All documents constituting, concerning, or relating to: treatment, billing, and coding worksheets and spreadsheets ; physician, chiropractor, and therapist orders and instructions; communication notices, notes, and memorandum to or from staff, employees, patients, physicians, chiropractors, therapists, TWR owners, case managers, billing agents or representatives, patients, and other health care providers; therapy or treatment notes and instructions; patient admission and discharge; referrals to physicians, diagnostic testing, x-rays and any other type of medical procedure; patient sign in sheets/visit logs; patient and employee payment, bonus, or expense logs; patient progress notes; DOL-OWCP pre-authorization records and communications; certificates of medical necessity; prescriptions; dispensing orders; orders for durable medical equipment; explanations of medical benefits; patient complaints or other communications including those related to treatment, services, benefits, money, cash, employees, and transportation; patient instructions or education about participation in the DOL-OWCP program.

3. All documents constituting, concerning, or relating to: the submission of claims for reimbursement to DOL-OWCP and other medical insurance providers, and receipt of payments from such, including but not limited to: hard copy faxes and email faxes, super-bills, communication including emails, notices, memorandum and instructions related to the submission of claims, OWCP Forms CA-1, CA-2, CA-7, OWCP-5, OWCP-16, OWCP-17, OWCP-44, OWCP-04, OWCP-915, OWCP-957, OWCP-1168, OWCP-1500, HCFA-1500, and related forms, supporting documentation, including drafts and edited versions.

4. All documents constituting, concerning, or relating to: the DOL-OWCP program, including and not limited to: manuals, newsletters, bulletins, publications, advisories, policies and procedures, correspondence, cancelled checks, and notices of over-payment.

5. All past and current employee and contractor personnel files, including but not limited to: licenses, certifications, training and education, employee handbooks or manuals, organizational charts, payroll records, cancelled checks, bonus payments or logs, employment and compensation agreements and records, W-2s, 1099s, work schedules, disciplinary records, unemployment commission records, termination notices and warnings, and job descriptions.

6. All contracts, agreements, or other documents including financial records, related to the provision of health care services by providers other than TWR and its offices, including but not limited to marketing agreements, compensation agreements, kick-backs, solicitations, receipt of remunerations, cancelled checks, payment logs, and bank account information.

7. All invoices and sales receipts for marketing expenses and clinic operations related to entertaining, marketing, payments, reimbursement to or from doctors, and payments, reimbursement to or from other medical providers.

8. All brochures and advertising materials related to the promotion of TWR and its offices, including but not limited to: items related to the TWR radio show, TWR sponsored picnics, marketing agreements, fairs, websites, business cards, Christmas cards, pamphlets, and other literature.

9. Financial books, bank statements, receipts, checks, records, and documents constituting, concerning, or relating to payments from TWR to employees, referral sources, union representatives, physicians, chiropractors, and outside providers of health care services, and payments received by TWR from the above any of the above sources.

10. Any information described in the proceeding paragraphs stored in electronic or magnetic media, electronic data processing and storage devices, computers and computer systems, including central processing units, internal and peripheral storage devices such as fixed disks, external hard disks, thumb drives, flash drives, floppy disk drives and diskettes, tape drives and tapes, optical storage devices such as modems, together with system documentation, operating logs and documentation, software and instruction manuals. Any and all records showing or bearing indicia of the use, ownership, possession or control of the computer equipment, accessories, telephone(s) and modems(s) such as usernames, passwords, invoices or warranty registrations. Any and all tapes, cassettes, hardware, computer disks, data disks, magnetic media, thumb drives, flash drives, floppy disk, tape systems, CD ROM disks, optical data storage media, hard disks and other computer relationship operational equipment.

   a) Your affiant knows that computer hardware, software, and electronic files may be important to a criminal health care fraud investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of the crime.

   b) In the present case, your affiant requests permission to search and seize records, including that which may be stored on a computer. Your affiant also requests permission to seize the computer hardware that may contain such records if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site. Based on first-hand knowledge as well as information provided by my investigative partners, computers are being used by TWR in relation to the crimes being investigated, and based on the almost universal presence and use of computers in American businesses, including medical businesses, at this time, your affiant believes that, in the present case, computer hardware is a container for evidence, was itself an instrumentality of the crime under investigation, and may be a container for contraband.

   c) Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search

computer equipment and storage devices for data for a number of reasons, including the following:

i. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

ii. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

iii. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would result in a stack of paper over four miles high. Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

iv. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily

change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

d) The computer forensic examiner will attempt to create an electronic "image" of all computers that are likely to store the evidence described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain a forensic copy of the computer's stored data without actually seizing the computer hardware. The computer forensic examiner or another technical expert will then conduct an off-site search for the evidence described in the warrant from the image copy at a later date.

11. If "imaging" proves impractical, or even impossible for technical reasons, then Affiant hereby requests the Court's permission to seize those components of the computer system that the computer forensic examiner believes must be seized to permit the agents to locate the evidence described in the warrant. The components will be seized and taken into the custody of the agent. The computer forensic examiner or another technical expert will then conduct an off-site search for the evidence described in the warrant at a later date. If employees of TWR so request, the computer forensic examiner will, to the extent practicable, attempt to provide the employees with copies of any files not within the scope of the warrant that may be necessary or important to the continuing function of TWR's legitimate business. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

12. Searching the computer system for the evidence described above will require a range of computer forensic analysis techniques. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. In order to properly execute the search authorized by the warrant, specially trained agents or forensic analysts will be required to conduct a thorough forensic

analysis of the seized media, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever computer forensic analysis techniques appear necessary to locate and retrieve the above-described evidence.